**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**
**MILWAUKEE DIVISION**

| | |
|---|---|
| Igor Zapadinsky, individually and on behalf of all others similarly situated, | 2:23-cv-00231 |
| Plaintiff, | |
| - against - | Class Action Complaint |
| Blue Diamond Growers, | |
| Defendant | Jury Trial Demanded |

Plaintiff alleges upon information and belief, except for allegations about Plaintiff, which are based on personal knowledge:

1.      Blue Diamond Growers ("Defendant") manufactures and sells almonds represented as made in a smokehouse ("Product").

 

2.      The relevant front label representations include pictures of what appear to be smoked almonds, "Blue Diamond Almonds" and "Smokehouse," across a red ribbon with glowing orange borders, coloring evocative of fire.

3.      Contrary to the front label, the Product is not made in a smokehouse, which misleads consumers.

## I.      SMOKING PROCESS

4.      Smoking is a method to prepare and preserve food by cooking it over a fire containing various kinds of wood chips, exposing it to smoke.

5.      The drying action of the smoke and the different phenol compounds help to preserve protein-rich foods such as meat, cheese, almonds, and fish.

6.      The origins of smoking date to prehistory, as nomadic peoples experimented with fire upon raw foods, like nuts and cheeses.

7.      The earliest record of smoked nuts comes from ancient times, when an owner of a cheese and nut shop was forced to share space in the *macellum* with a baker.[1]

8.      It was learned that wood provides unique and powerful flavors, based on the type used.

9.      For example, wood chips from deciduous hardwood trees of the genus *Carya*, hickory, provide hearty and sweet flavors to nuts ("hickory").

10.     Pecan wood gives nuts a spicy taste while oak gives smoked flavors of moderate intensity.

---

[1] *Macellum* is the Italian name for the farmer's markets of ancient Roman that sold freshly made foods.

## II. "SMOKEHOUSE" DESCRIBES A PHYSICAL STRUCTURE FOR SMOKING FOODS

11.     The center of the front packaging contains the word "Smokehouse®" in large font.

12.     The word "smokehouse" is a noun that describes a physical structure where food is prepared through the process of using actual smoke.

13.     This is confirmed by numerous dictionary definitions.

14.     Merriam-Webster defines a smokehouse as "[A] building where meat or fish is cured by means of dense smoke."

15.     The Oxford English Dictionary Online defines it as "[A] house or room used for curing meat, fish, etc., by means of smoke."

16.     Collins Dictionary defines it as "a building, esp. an outbuilding on a farm, where meats, fish, etc. are cured by smoke."

17.     Google Dictionary, based on its leading search engine which is designed to deliver the most relevant and accurate results, defines a smokehouse as "a shed or room for curing food by exposure to smoke."

18.     The Britannica Dictionary defines it as "a shed or room for curing food by exposure to smoke."

19.     In an industrial smoking process, foods, such as almonds, are put on a large tray and slid into an enclosed structure, referred to as a smokehouse.

## III. CONSUMERS VALUE FOODS MADE THROUGH NATURAL PROCESSES LIKE SMOKING IN A SMOKEHOUSE

20.     The popularity of using smokehouses to smoke foods decreased in the mid-twentieth

3

century due to the introduction of chemical preservatives and artificial smoke flavorings.[2]

21. However, consumer research company Mintel determined that the last two decades have seen a resurgence in consumer demand for foods made through natural processes, like in a smokehouse, without advanced chemistry and synthetic ingredients.

22. This is due to regular media reports of potentially dangerous and environmentally harmful substances in foods, due to the work of non-profits such as the Environmental Working Group ("EWG").

23. This is especially true in the context of foods promoted as smoked or made in a smokehouse, as the European Food Safety Authority ("EFSA") confirmed that smoke flavorings contain compounds at levels high enough to pose a toxic risk when consumed.

24. Added smoke flavor is not only an issue of consumer health, but of quality and value.

25. Whether a food has been smoked over hardwoods or contains liquid smoke, prepared by pyrolysis of sawdust, is basic front label information consumers rely on when making quick purchasing decisions at the grocery store.

26. Research by Innova Market Insights confirmed that consumers look to see if the front label has any statement about a product's flavor, because they prefer foods which get their taste from the natural processes by which the food is prepared, such as in a smokehouse.

## IV. BEYOND MISLEADING CONSUMERS, THE LABELING VIOLATES RELEVANT REGULATIONS

27. Beyond misleading consumers to expect almonds prepared in a smokehouse, the labeling does not comply with federal and identical state regulations.

28. The Product makes "direct or indirect representations" about its primary or

---

[2] Matthew Sedacca, Liquid Smoke: The History Behind a Divisive Culinary Shortcut – Barbecue's love/hate relationship with the manufactured flavor, Eater.com, Jun 15, 2016.

"characterizing" flavor of smoke, through the word, "Smokehouse," a noun, and the red and orange coloring, evocative of fire. 21 C.F.R. § 101.22.

29.    According to the well-respected regulatory attorney Bob Holmes, these rules are "premised on the simple notion that consumers value 'the real thing' versus a close substitute and should be able to rely on the label to readily distinguish between the two. This consumer protection objective is relevant to taste claims conveyed in advertising as well."[3]

30.    Hon. H. C. Adams, a Wisconsin Food Commissioner before representing this State's Second Congressional District, was critical of foods labeled as being smoked "that smoke never touched and which obtained their color and flavor from a poisonous solution called 'liquid smoke.'"

31.    When the FDA enacted the regulations for flavoring, they followed Adams' guidance, and considered it misleading to describe nuts as "smoked" when "true smoke is absorbed in a liquid or other medium, and that medium is added to a food to provide a smoke flavor."

32.    Where a food's flavor does not come exclusively from a characterizing ingredient or processing method, but contains natural flavor derived from that ingredient or processing method, this must be disclosed to consumers on the front label, in addition to on the ingredient list. *See* 21 C.F.R. § 101.22(i); ATCP 90.10 (1) ("food sold or distributed for sale in this state shall be labeled in compliance with applicable rules adopted by the United States food and drug administration under 21 CFR 101, 102, 104, 105, and 130.").

33.    The representation of the Product with the term "Smokehouse" violates 21 U.S.C. § 343(a)(1) and ch. 97.03 ("Standards; misbranding."), which deem food misbranded when the label

---

[3] Steven Steinborn, Hogan & Hartson LLP, Regulations: Making Taste Claims, PreparedFoods.com, August 11, 2006.

contains a statement that is "false or misleading in any particular."

34.   In evaluating whether a product's labeling is misleading, federal and state regulations consider not only the statements made but also the extent to which the labeling fails to reveal material facts in light of such representations. Ch. 97.07 ("Interpretation.").

35.   The statement of "Smokehouse" with red and orange coloring fails to reveal the almonds have no connection to being smoked over hardwoods, neither in a smokehouse or anywhere else.

36.   As the almonds are represented as made in a smokehouse, even though they are not, and contain added liquid smoke flavoring, this must be disclosed to consumers on the front label.

37.   The FDA has repeatedly warned companies that not disclosing the source of a food's smoked taste is misleading:

> If these smoke ingredients [natural smoke flavor] are added flavors, they should be declared in accordance with 21 CFR 101.22 [on the front of the label]; however, if these ingredients describe the smoking process, then they must not be listed as ingredients in the ingredient statement.[4]

38.   The FDA has cautioned that a label "should not include the term 'smoked'" or similar variations which misrepresent whether a food was subject to smoking, such as in a smokehouse.

39.   Instead, foods that are not made in a smokehouse should contain a prominent statement such as "'with added smoke flavor,' 'smoke flavored,' or with 'natural smoke flavor.'"

## V.   "SMOKEHOUSE" IS MISLEADING BECAUSE PRODUCT NOT MADE IN A SMOKEHOUSE

40.   The sole meaning of "Smokehouse" goes directly to the fire-infused process by

---

[4] FDA, Warning Letter, Smoked Seafood, Inc. dba Little Mermaid Smokehouse, MARCS-CMS 515739, June 27, 2017; FDA, Warning Letter, Walnut Creek Kitchens, Inc., CIN-15-436857-08, Nov. 27, 2014.

which a food is prepared, without any qualifying or clarifying language.

41. Though the term "Smokehouse" has a small trademark designation next to it, this fails to put consumers on notice that the Product is not smoked in a smokehouse and gets its smoked taste exclusively from added smoke flavor.

42. There is no reason to expect that because a representation may carry a trademark registration that it should mean the thing described is false or that it is necessarily fanciful.

43. Consumers will reasonably expect the Product to have been made in a smokehouse.

44. However, the Product has not been subjected to any smoking.

45. The ingredients include "NATURAL HICKORY SMOKE FLAVOR," which is defined as "smoke condensed into a liquid form."



**INGREDIENTS:** ALMONDS, VEGETABLE OIL (CANOLA, SAFFLOWER AND/OR SUNFLOWER), SALT, CORN MALTODEXTRIN, NATURAL HICKORY SMOKE FLAVOR, YEAST, HYDROLYZED CORN AND SOY PROTEIN, NATURAL FLAVORS.

46. The Product uses "NATURAL HICKORY SMOKE FLAVOR" to try and make the almonds taste like they were made in a smokehouse, even though they were not.

## VI.   REAL SMOKED ALMONDS ARE COMMON FOOD

47. Almonds prepared in a smokehouse are not a rare or pricy delicacy that would make a reasonable consumer doubt the veracity of the "Smokehouse" claim by reviewing the fine print of the ingredient list.

48.     Even if Plaintiff and consumers viewed the ingredient list, they would have no reason to know that listing "natural hickory smoke flavor" forecloses the possibility the Product was also subject to smoking in a smokehouse.

49.     Numerous non-professional food websites describe the simple process of preparing authentic smoked almonds.

50.     These steps include (1) soaking in a brine solution, followed by (2) roasting in oils and (3) deposited into a wire mesh basket and inserted into a smoker for several hours.

51.     Almonds that are smoked in a smokehouse exist in the marketplace and are not technologically or otherwise unfeasible to produce and consume, shown by the example below of Hickory Smoked Almonds, printed across an image of a smokehouse.



52.     These products are labeled identically to the Smokehouse Almonds, yet the latter is not smoked and has added smoke flavor, while the former are smoked over hickory woods in a

smokehouse.

53. Where almonds have a smoked taste not from being prepared in a smokehouse, but due to added smoke flavor, competitor brands truthfully disclose this fact on the front label, such as "Smoked Almonds – Naturally Flavored" (Planters) and "Natural Smoke Flavored Almonds With Other Natural Flavors" (Walmart Great Value brand) in contrast to Defendant's "Smokehouse Almonds" (left) *See* 21 C.F.R. § 101.22(i)(1)(i); 21 C.F.R. § 101.22(i)(1)(iii).

  

54. The disclosure on a front label of whether a food is smoked in a smokehouse or only has added smoke flavor is basic information on which consumers rely when making quick purchasing decisions at the store.

55. Consumers are misled because the absence of qualifying terms with "Smokehouse,"

such as "naturally flavored" or "natural smoke flavored almonds" gives them the false impression the Product was made in a smokehouse.

## VII. ADDED SMOKE FLAVOR IS NOT EQUIVALENT TO BEING MADE IN A SMOKEHOUSE

56.     Though the Product is not made in a smokehouse, it adds "NATURAL HICKORY SMOKE FLAVOR" to make consumers think it was made in a smokehouse.

57.     Scientists concluded that there are at least 400 flavor compounds which are created when foods are made in a smokehouse.

58.     These include pyrazines, aliphatic, aromatic hydrocarbons, alcohols, organic acids, esters, furans, phenols, carbonyl and non-carbonyl compounds, and various oxygen- and nitrogen-containing heterocyclic compounds.

59.     Added smoke flavor is unable to make the Product taste like it was made in a smokehouse for several reasons.

60.     First, added smoke flavoring lacks the delicate balance of phenolic compounds, including 2,3-Butanedione, 2,3-Pentanedione, 3-Butanoic acid, 3-Methylbutanoic acid, 4-Ethylguaiacol, 4-Propylguaiacol and/or 4-Vinylguaiacol.

61.     Second, inside a smokehouse, the smoke generation process dramatically influences the wood-smoke chemical composition, generating compounds that are not capable of being included in a "natural smoke flavor," like trans-isoeugenol and 4-methylsyringol.

62.     When foods like almonds are exposed to volatiles and particulate matter in a smokehouse, they undergo chemical reactions which form new flavor compounds.

63.     Third, certain compounds only serve as intermediates in the formation of more stable forms of compounds which are essential to the aroma of smoke.

64.     Fourth, in most systems which seek to emulate a smokehouse, there is only a focus

on volatile compounds which are believed to have distinctive odor properties at low concentrations.

65.     This overlooks that nonvolatile compounds significantly contribute to smoke flavor.

**VIII. CONCLUSION**

66.     Defendant makes other representations and omissions with respect to the Product which are false and misleading.

67.     Reasonable consumers must and do rely on a company to honestly and lawfully market and describe the components, attributes, and features of a product, relative to itself and other comparable products or alternatives.

68.     The value of the Product that Plaintiff purchased was materially less than its value as represented by Defendant.

69.     Defendant sold more of the Product and at higher prices than it would have in the absence of this misconduct, resulting in additional profits at the expense of consumers.

70.     Had Plaintiff and proposed class members known the truth, they would not have bought the Product or would have paid less for it.

71.     As a result of the false and misleading representations, the Product is sold at a premium price, approximately no less than no less than $1.19. per 1.5 OZ, and correspondingly higher absolute prices when sold in larger sizes, excluding tax and sales, higher than similar products, represented in a non-misleading way, and higher than it would be sold for absent the misleading representations and omissions.

<u>Jurisdiction and Venue</u>

72.     Jurisdiction is based on the Class Action Fairness Act of 2005 ("CAFA"). 28 U.S.C. § 1332(d)(2).

73.     The aggregate amount in controversy exceeds $5 million, including any statutory and punitive damages, exclusive of interest and costs.

74.     Plaintiff Igor Zapadinsky is a citizen of Wisconsin.

75.     Defendant Blue Diamond Growers is a California agricultural cooperative with a principal place of business in Sacramento, Sacramento County, California.

76.     The class of persons Plaintiff seeks to represent includes persons who are citizens of different states from which Defendant is a citizen

77.     The members of the class Plaintiff seeks to represent are more than 100, because the Product has been sold for several years, with the representations described here, in thousands of locations, in the states covered by Plaintiff's proposed classes.

78.     The Product is sold in numerous sizes such as individual smaller pouches, large pouches, and tins, with identical representations.

79.     The Product is available to consumers from third-parties, which includes grocery stores, dollar stores, warehouse club stores, drug stores, convenience stores, big box stores, and/or online, in the States covered by Plaintiff's proposed classes.

80.     Venue is in this District, with assignment to the Milwaukee Division, because a substantial part of the events or omissions giving rise to these claims occurred in Walworth County, including Plaintiff's purchase, transactions, consumption and/or use of the Product and exposure to, awareness and/or experiences of and with the issues described here.

<u>Parties</u>

81.     Plaintiff Igor Zapadinsky is a citizen of Lake Geneva, Wisconsin, Walworth County.

82.     Defendant Blue Diamond Growers is a California agricultural cooperative with a principal place of business in Sacramento, California, Sacramento County.

83. Defendant is the largest cooperative of almond growers in the world.

84. Consumers value Blue Diamond branded almond snacks over competitors, because they know Blue Diamond is responsible for the almonds, which assures them of quality and their products' integrity.

85. Plaintiff purchased the Product on one or more occasions within the statutes of limitations for each cause of action alleged, at stores including Costco, 15300 W Grange Ave, New Berlin, Wisconsin between 2021 and the present, and/or among other times.

86. Plaintiff believed and expected the Product was made in a smokehouse instead of having added liquid smoke flavor, even though it was not made in a smokehouse because that is what the representations and omissions said and implied.

87. Plaintiff relied on the words, terms coloring, descriptions, layout, packaging, and/or images on the Product, on the labeling, statements, omissions, claims, statements, and instructions, made by Defendant or at its directions, in digital, print and/or social media, which accompanied the Product and separately, through in-store, digital, audio, and print marketing.

88. Plaintiff bought the Product at or exceeding the above-referenced price.

89. Plaintiff paid more for the Product than he would have had he known it was not made in a smokehouse or with any real smoke, would have paid less or not purchased it.

90. Plaintiff chose between Defendant's Product and products represented similarly, but which did not misrepresent their attributes, requirements, features, and/or components.

91. The Product was worth less than what Plaintiff paid, and he would not have paid as much absent Defendant's false and misleading statements and omissions.

92. Plaintiff intends to, seeks to, and will purchase the Product again when he can do so with the assurance the Product's representations are consistent with its abilities, attributes, and/or

composition.

93.     Plaintiff is unable to rely on the labeling and representations not only of this Product, but other similar almonds represented as smoked, because he is unsure whether those representations are truthful.

94.     Plaintiff is unable to rely on the labeling and representations not only of this Product, but other nuts represented as being smoked because he is unsure whether those representations are truthful.

95.     If Defendant's labeling were to be truthful, Plaintiff could rely on the labeling of other nuts represented as being smoked.

<u>Class Allegations</u>

96.     Plaintiff seeks certification under Fed. R. Civ. P. 23 of the following classes:

> **Wisconsin Class:** All persons in the State of Wisconsin who purchased the Product during the statutes of limitations for each cause of action alleged; and
>
> **Consumer Fraud Multi-State Class**: All persons in the Puerto Rico, U.S. Virgin Islands, American Samoa, Guam, and Arizona who purchased the Product during the statutes of limitations for each cause of action alleged.

97.     Common questions of issues, law, and fact predominate and include whether Defendant's representations were and are misleading and if Plaintiff and class members are entitled to damages.

98.     Plaintiff's claims and basis for relief are typical to other members because all were subjected to the same unfair, misleading, and deceptive representations, omissions, and actions.

99.     Plaintiff is an adequate representative because his interests do not conflict with other members.

100. No individual inquiry is necessary since the focus is only on Defendant's practices and the class is definable and ascertainable.

101. Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest relative to the scope of the harm.

102. Plaintiff's counsel is competent and experienced in complex class action litigation and intends to protect class members' interests adequately and fairly.

103. Plaintiff seeks class-wide injunctive relief because the practices continue.

Wisconsin Unfair Trade Practices Act ("UTPA"),
Wis. Stat. § 100.20
(Wisconsin Class)

104. Plaintiff incorporates by reference all preceding paragraphs.

105. The representations on the Product constitute an advertisement to the public.

106. Wisconsin and federal regulations require that any food which has a primary recognizable flavor disclose the source of that flavor on the front label, so consumers can see it.

107. Violations of Chapter ATCP 90 are subject to the penalties and remedies of 100.20(5).[5]

108. In its order promulgating chapter ATCP 90, DATCP stated that "Under [Wis. Stat. §] 97.09(1), ... federal rules related to food definitions and standards of [] quality [] are automatically enforceable under state law."

109. Wis. Stat. § 100.20(5) permits "[A]ny person suffering pecuniary loss because of a violation by any other person of any order issued under this section may sue for damages therefor in any court of competent jurisdiction."

110. Defendant violates § ATCP 90.02(1) because the Product's declaration of

---

[5] Note, Chapter ATCP 90.

"Smokehouse" is not the Product's "common or usual name," "legally required name," or an "appropriate description that is readily understood by consumers," because it is not smoked.

111. Defendant violates Wis. Admin. Code § ATCP 90.02(3) and Wis. Stat. § 97.02 because flavoring components added through smoking almonds over hardwoods are not present in the Product in any amount, rendering the declaration of the Product's identity, "Almonds – Smokehouse," false, deceptive, and misleading.

112. Defendant violates Wis. Admin. Code § ATCP 90.10(1) because the Product is not labeled in compliance with the applicable FDA rules and regulations, based on violations of 21 C.F.R. §§ 101.22(i)(1)(i).

113. The representation of the Product as made in a smokehouse and gets its smoked taste from being smoked violates Wis. Stat. § 100.183(1) and Wis. Stat. § 97.03 because that advertisement is untrue, deceptive or misleading.

114. Plaintiff suffered a pecuniary loss due to Defendant's violation of Wis. Admin. Code §§ ATCP 90.02 and 90.10.

115. Plaintiff believed the Product was made in a smokehouse instead of having added liquid smoke flavor, even though it was not made in a smokehouse.

116. Plaintiff and class members desired to purchase a product with the attributes highlighted by the labeling – a smoked taste from being smoked over hardwoods and not from added smoke flavoring.

117. Defendant's false and deceptive representations and omissions are material in that they are likely to influence consumer purchasing decisions.

118. Plaintiff relied on the representations and omissions to believe the Product was made in a smokehouse instead of having added liquid smoke flavor, even though it was not made in a

smokehouse.

119.   Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

<u>Violation of State Consumer Fraud Acts</u>
<u>(Consumer Fraud Multi-State Class)</u>

120.   The Consumer Fraud Acts of the States in the Consumer Fraud Multi-State Class are similar to the consumer protection statute invoked by Plaintiff and prohibit the use of unfair or deceptive business practices in the conduct of commerce.

121.   The members of the Consumer Fraud Multi-State Class reserve their rights to assert their consumer protection claims under the Consumer Fraud Acts of the States they represent and/or the consumer protection statute invoked by Plaintiff.

122.   Defendant intended that members of the Consumer Fraud Multi-State Class would rely upon its deceptive conduct.

123.   As a result of Defendant's use of artifice, and unfair or deceptive acts or business practices, the members of the Consumer Fraud Multi-State Class sustained damages.

124.   Defendant's conduct showed motive and a reckless disregard of the truth such that an award of punitive damages is appropriate.

<u>Breaches of Express Warranty,</u>
<u>Implied Warranty of Merchantability/Fitness for a Particular Purpose and</u>
<u>Magnuson Moss Warranty Act, 15 U.S.C. §§ 2301, <i>et seq</i>.</u>

125.   The Product was manufactured, identified, marketed, and sold by Defendant and expressly and impliedly warranted to Plaintiff and class members that it was made in a smokehouse instead of having added liquid smoke flavor, even though it was not made in a smokehouse.

126.   Defendant directly marketed the Product to Plaintiff and consumers through its advertisements and marketing, through various forms of media, on the packaging, in print

circulars, direct mail, and targeted digital advertising.

127.   Defendant knew the product attributes that potential customers like Plaintiff were seeking and developed its marketing and labeling to directly meet those needs and desires.

128.   Defendant's representations about the Product were conveyed in writing and promised it would be defect-free, and Plaintiff understood this meant that it was made in a smokehouse instead of having added liquid smoke flavor, even though it was not made in a smokehouse.

129.   Defendant's representations affirmed and promised that the Product was made in a smokehouse instead of having added liquid smoke flavor, even though it was not made in a smokehouse.

130.   Defendant described the Product so Plaintiff and consumers believed it was made in a smokehouse instead of having added liquid smoke flavor, even though it was not made in a smokehouse, which became part of the basis of the bargain that it would conform to its affirmations and promises.

131.   Defendant had a duty to disclose and/or provide non-deceptive descriptions and marketing of the Product.

132.   This duty is based on Defendant's outsized role in the market for this type of Product, the leading name in almonds, trusted by consumers to make and sell almond products truthfully.

133.   Plaintiff recently became aware of Defendant's breach of the Product's warranties.

134.   Plaintiff provided or will provide notice to Defendant, its agents, representatives, retailers, and their employees.

135.   Plaintiff hereby provides notice to Defendant that it breached the express and implied warranties associated with the Product.

136.   Defendant received notice and should have been aware of these issues due to complaints by third-parties, including regulators, competitors, and consumers, to its main offices, and by consumers through online forums.

137.   The Product did not conform to its affirmations of fact and promises due to Defendant's actions.

138.   The Product was not merchantable because it was not fit to pass in the trade as advertised, not fit for the ordinary purpose for which it was intended and did not conform to the promises or affirmations of fact made on the packaging, container or label, because it was marketed as if it was made in a smokehouse instead of having added liquid smoke flavor, even though it was not made in a smokehouse.

139.   The Product was not merchantable because Defendant had reason to know the particular purpose for which the Product was bought by Plaintiff, because he expected it was made in a smokehouse instead of having added liquid smoke flavor, even though it was not made in a smokehouse, and he relied on Defendant's skill and judgment to select or furnish such a suitable product.

140.   Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

<u>Negligent Misrepresentation</u>

141.   Defendant had a duty to truthfully represent the Product, which it breached.

142.   This duty was non-delegable, and based on Defendant's position, holding itself out as having special knowledge and experience in this area, the leading name in almonds, trusted by consumers to make and sell almond products truthfully.

143.   Defendant's representations and omissions regarding the Product went beyond the

specific representations on the packaging, as they incorporated the extra-labeling promises and commitments to quality, transparency and putting customers first, that it has been known for.

144. These promises were outside of the standard representations that other companies may make in a standard arms-length, retail context.

145. The representations took advantage of consumers' cognitive shortcuts made at the point-of-sale and their trust in Defendant.

146. Plaintiff and class members reasonably and justifiably relied on these negligent misrepresentations and omissions, which served to induce and did induce, their purchase of the Product.

147. Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

Fraud

148. Defendant misrepresented and/or omitted the attributes and qualities of the Product, that it was made in a smokehouse instead of having added liquid smoke flavor, even though it was not made in a smokehouse.

149. Moreover, the records Defendant is required to maintain, and/or the information inconspicuously disclosed to consumers, provided it with actual and constructive knowledge of the falsity and deception, through statements and omissions.

150. Defendant knew of the issues described here yet did not address them.

151. Defendant's fraudulent intent is evinced by its knowledge that the Product was not consistent with its representations.

Unjust Enrichment

152. Defendant obtained benefits and monies because the Product was not as represented and expected, to the detriment and impoverishment of Plaintiff and class members, who seek

restitution and disgorgement of inequitably obtained profits.

<u>Jury Demand and Prayer for Relief</u>

Plaintiff demands a jury trial on all issues.

**WHEREFORE**, Plaintiff prays for judgment:

1.  Declaring this a proper class action, certifying Plaintiff as representative and the undersigned as counsel for the class;

2.  Entering preliminary and permanent injunctive relief by directing Defendant to correct the challenged practices to comply with the law;

3.  Injunctive relief to remove, correct and/or refrain from the challenged practices and representations, and restitution and disgorgement for members of the class pursuant to the applicable laws;

4.  Awarding monetary damages, statutory and/or punitive damages pursuant to any statutory claims and interest pursuant to the common law and other statutory claims;

5.  Awarding costs and expenses, including reasonable fees for Plaintiff's attorneys and experts; and

6.  Other and further relief as the Court deems just and proper.

Dated:   February 19, 2023

Respectfully submitted,

/s/Spencer Sheehan
Sheehan & Associates, P.C.
60 Cuttermill Rd Ste 412
Great Neck NY 11021
(516) 268-7080
spencer@spencersheehan.com